UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLINTON GREYLING,<br><br>Defendant | Criminal No. 24cr10222<br><br>Violation:<br><br>Count One: Acting as an Unregistered Broker; Aiding & Abetting<br>(15 U.S.C. §§ 78o(a)(1) and 78ff(a); 18 U.S.C. § 2)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1. The defendant, CLINTON GREYLING, was a resident of Florida. GREYLING was the President of Trends Investments Inc. ("Trends"), which sold securities of fledgling public companies that were engaged in mergers. GREYLING was also the President of Trends Mergers & Acquisitions LLC, which claimed to specialize in "reverse merger activities for public companies."

2. Individual 1 was a resident, variously, of Florida, Maine, and Massachusetts. Individual 1 purported to be the president of an "International Advisory and Investment Company" that was also a "Private Wealth Fund Manager." Individual 1 also identified himself to customers as their broker or wealth manager and as an "Internal Investment Banker" for Trends. In fact, neither Individual 1 nor his purported company was registered as a broker with the U.S. Securities & Exchange Commission ("SEC"), nor was Individual 1 associated with a registered broker.

Individual 1 had previously been associated with a registered broker between in or about 2005 and 2009.  Individual 1 died in or about June 2023.

3. Brokers registered with the SEC are generally subject to certain duties and obligations, among them a duty of fair dealing with their customers and an obligation to recommend only those investments or investment strategies that are suitable for their customers.

4. Alterola Biotech Inc. ("Alterola") was a Nevada corporation that variously purported to be involved in mineral exploration, medicinal chewing gum, and therapeutic cannabinoids.  Its shares were quoted on the over-the-counter securities market under the ticker symbol "ALTA" but traded only sporadically and in small amounts.

5. Token Communities Ltd., formerly known as Extract Pharmaceuticals Inc. and, before that, Pacific Media Group Enterprises ("Token Communities") was a Delaware corporation that variously purported to be involved in mobile applications, medicinal chewing gum, and blockchain technology.  Its shares were quoted on the over-the-counter securities market under the ticker symbol TKCM but traded only sporadically and in small amounts.

## Overview of Unregistered Broker Scheme

6. Between in or about February 2017 and in or about June 2019, GREYLING assisted Individual 1 to act as an unregistered broker in connection with sales of ALTA, TKCM, and other securities to individuals throughout the United States.  GREYLING, through his company, Trends, touted Alterola and Token Communities as promising companies that were about to enter new and exciting business lines via mergers.  Trends, however, did not yet own the Alterola shares it purported to sell.  And when Trends finally provided customers with their Alterola shares up to two and one-half years after receiving the customers' money, the shares were often in restricted form, which precluded the customers from depositing and selling them in a timely manner.

Similarly, the Token Communities shares that Trends sold to customers were ultimately worthless as a practical matter. Contrary to Individual 1's representations, customers were generally unable to deposit or trade the securities because Token Communities failed to file all the necessary financial reports with the SEC in a timely fashion.

<u>Individual 1's Sales of ALTA & TKCM Shares for Trends</u>

7. As part of the scheme, Individual 1 solicited customers to purchase securities from Trends by falsely holding himself out as a broker or wealth manager and telling customers that the securities were promising investments. Individual 1, however, was not registered as a broker with the SEC, as required.

8. Individual 1 forwarded customers wire payment instructions for Trends and received a commission from Trends of approximately 40 percent of the sales. Neither Individual 1 nor GREYLING disclosed this exceptionally high commission rate to customers.

9. Through this scheme, Individual 1 generated more than $1.9 million for GREYLING's company from over 25 customers and Trends, at GREYLING's direction, paid Individual 1 more than $800,000 in commissions.

10. GREYLING assisted Individual 1 to act as an unregistered broker by, among other actions: (i) providing Individual 1 and Individual 1's customers with positive information about the companies and with "shareholder updates," which included information about when Individual 1's customers would purportedly receive their shares, when the companies would purportedly be current on their public financial filings, and when the companies' securities would purportedly begin active trading on the over-the-counter market; (ii) providing Individual 1 with template stock purchase agreements bearing GREYLING's signature to facilitate customer orders; and (iii) directing commission payments to Individual 1.

11. For example, on or about February 23, 2017, Individual 1 emailed Customer 1, a Massachusetts resident, a stock purchase agreement ("SPA") offering to have Trends sell the customer 100,000 free-trading (*i.e.*, unrestricted) shares of Alterola for $50,000. Individual 1 wrote, "I really took care of you on this one!!!"

12. Customer 1 signed the agreement and sent it to Individual 1, who forwarded it to GREYLING. Customer 1 also wired Trends $50,000.

13. Four days later, on or about February 27, 2017, Individual 1 emailed Customer 1 a second SPA, this time offering to sell 200,000 free-trading Alterola shares for $100,000. Individual 1 stated "You are about to become a millionaire."

14. On or about March 5, 2017, GREYLING sent Customer 1 an email about Alterola's purported "huge market potential" in the "medical cannabis sector." The email stated that Trends was "RAISING $600 K NOW AT A SEED CAPITAL SHARE PRICE THAT WILL GIVE INVESTORS 10 X INVESTMENT RETURN IN 4 TO 8 WEEKS." The email further stated that "TRENDS INVESTMENTS WILL BE PROMOTING ALTEROLA 'ALTA' AS [THE] NEXT BIG CANNABIS STORY BROUGHT TO WALL STREET BY TRENDS INVESTMENTS INC."

15. Trends and Individual 1 were unable to deliver on Trends' obligations under the SPAs or on their promised investment returns. In reality, the market for ALTA was nearly nonexistent, and fewer than 5,000 shares had traded in the public markets since January 1, 2016. Trends also did not yet own or control any Alterola shares and, as a result, Trends did not provide any Alterola shares to Customer 1 until more than two years after receiving Customer 1's money. And the shares Trends ultimately did provide were in restricted form, thereby precluding Customer 1 from being able to deposit and sell them in the public market in a timely manner.

16. As another example, on or about March 2, 2017, Individual 1 emailed Customer 2, a New Mexico resident, a SPA pursuant to which Trends offered to sell the customer 40,000 free-trading shares of Alterola for $20,000. On or about March 6, 2017, Individual 1 sent Customer 2 a follow-up email falsely stating that Alterola "is starting to trade today." Individual 1 also wrote "I am taking good care of you" and that the stock "is Trading at 3 dollars right now."

17. In reality, no Alterola shares traded that day and fewer than 3,000 ALTA shares traded during the next two years.

18. Customer 2 wired Trends $20,000 for the Alterola shares but did not receive any shares from GREYLING's company for more than two years because, as noted above, Trends did not yet own any Alterola shares in March 2017. The Alterola shares Customer 2 ultimately received were then in restricted form.

19. On or about March 23, 2017, Individual 1 emailed GREYLING requesting a payment of $100,000, equal to a 40 percent commission on his sales to Customer 1 and Customer 2. Trends thereafter wired Individual 1 over $100,000 over multiple payments between March and July 2017.

20. On or about April 6, 2018, GREYLING emailed Individual 1 a document titled "Greetings.docx." GREYLING told Individual 1, "This is the only approved greeting email that you are authorized to send out for TKCM." The greeting email solicited prospective customers to buy shares of Token Communities, which had recently announced a reverse merger and a purported business plan focused on blockchain technology. The greeting email stated that Trends "understand[s] the trust and responsibility that clients place in our hands" and that "[e]verything you need to complete the trade" was attached. The greeting email further stated, "We are expected to start trading on the OTC Market within 30 days."

21.     Individual 1 thereafter sent the greeting email, or close variants of it, to numerous prospective customers between April and July 2018. Individual 1 told prospective customers, in substance, that Trends expected shares of Token Communities to begin trading within weeks. More than twenty customers subsequently purchased TKCM shares from Trends.

22.     None of the customers, however, were able to deposit and sell their TKCM shares at any point in 2018 or early 2019 because, among other things, Token Communities did not timely file all its financial statements with the SEC, which statements were required to be publicly available before brokers could accept the shares for deposit.

23.     More than one year later, in or about September 2019, GREYLING wrote a "shareholder update" for Individual 1's customers which said, "Corporate counsel is currently preparing all necessary documents to ensure everything is ready for the filing 2 [sic] delinquent audited financial [statements]."

24.     On or about April 1, 2019, Individual 1 emailed Customer 3, a Texas resident, a SPA offering to have Trends sell 10,000 shares of Alterola for $5,000. On or about April 17, 2019, Individual 1 texted Customer 3, referring to himself as "your new broker at Trends Investments," and asking Customer 3 to return the signed agreement.

25.     On or about April 18, 2019, Customer 3 returned a signed agreement for 20,000 Alterola shares and wired $10,000 to Trends. On or about April 26, 2019, at GREYLING's direction, Trends wired $3,000 to Individual 1.

26.     On or about May 24, 2019, Individual 1 emailed GREYLING that he was going to "hit up" several customers, including Customer 3. On or about June 11, 2019, Individual 1 texted Customer 3 a picture of himself, writing, "That's a picture of me so you know who's your Wealth Manager." As a result of a solicitation from Individual 1, Customer 3 subsequently purchased

86,000 shares of TKCM and wired $43,000 to Trends on or about June 17, 2019.  On or about June 26, 2019, at GREYLING's direction, Trends wired $9,200 to Individual 1.

## COUNT ONE
### Acting as an Unregistered Broker; Aiding and Abetting
(15 U.S.C. §§ 78o(a)(1) and 78ff(a); 18 U.S.C. § 2)

The United States Attorney charges:

27. The United States Attorney re-alleges and incorporates by reference paragraphs 1 to 26 of this Information.

28. Between in or about February 2017 and in or about June 2019, in the District of Massachusetts and elsewhere, the defendant,

## CLINTON GREYLING,

together with Individual 1 and others known and unknown to the United States Attorney, did willfully make use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, and to induce and attempt to induce the purchase and sale of securities by others without registering as a broker with the U.S. Securities & Exchange Commission, and without having an exemption or exception from such registration.

All in violation of Title 15, United States Code, Sections 78o(a)(1) and 78ff(a), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

29. Upon conviction of the offense set forth in Count One, the defendant,

CLINTON GREYLING,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

30. If any of the property described in Paragraph 29 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 29 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

                                     JOSHUA S. LEVY
                                     Acting United States Attorney

By:    _____
        JAMES R. DRABICK
        Assistant United States Attorney

Date: July 30, 2024

10