UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 24-cr-10222-RGS |
| ) | |
| CLINTON GREYLING, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this sentencing memorandum regarding defendant Clinton Greyling. To raise capital for speculative business plans for two different companies, Greyling engaged a former registered stockbroker, who, it would turn out, was anything but upstanding. Greyling agreed to pay the individual—Individual 1—an undisclosed 40% commission on all shares sold to retail customers by Greyling's firm, Trends Investments, Inc. Individual 1 proved to be productive, generating over $1.9 million in sales from over 25 customers between 2017 and 2019. At no point during this period, however, was Individual 1 registered as a broker with the U.S. Securities & Exchange Commission ("SEC"), as required by federal securities laws. Such registration is an important part of the regulatory structure that requires brokers to honor a duty of fair dealing and an obligation to recommend only suitable investments. Individual 1, with Greyling's knowing assistance, willfully avoided that registration requirement.

For the reasons discussed below, and based on the entire record in this case, the government submits that a sentence of one year probation, with the first six months served on home detention, is sufficient but not greater than necessary to satisfy the goals of sentencing. Accordingly, the government respectfully asks the Court to accept the plea agreement in this matter, which was reached pursuant to Rule 11(c)(1)(C). The government further requests that the Court grant the government's provisional motion for an Order of Forfeiture (Money Judgment) and incorporate the forfeiture amount of $229,576 into the judgment. *See* Dkt. #17 (forfeiture motion).

**FACTUAL BACKGROUND**

The government appreciates that the Court is well familiar with the facts involved in this matter as a result of having recently overseen a bench trial in the parallel civil enforcement action, *SEC v. Trends Investments, Inc., et al.*, 22-cv-10889-RGS. The government provides the following summary of the relevant conduct for purposes of sentencing in this narrower criminal matter.

Between February 2017 and June 2019, Greyling owned and ran the firm Trends Investments, Inc. ("Trends"), which (among other activities) sold securities of fledgling public companies that were engaged in mergers. Two such public companies were Alterola Biotech Inc. ("Alterola") and Token Communities Ltd. ("Token Communities"), which claimed to be involved with various emerging technologies, including therapeutic cannabinoids and blockchain technology. While both companies' shares were traded on the over-the-counter securities market, they traded only sporadically and in small amounts. Greyling, however, touted both companies as promising businesses that were about to enter new and exciting business lines via mergers. To raise capital to support the companies' business plans, Greyling engaged Individual 1 to sell shares of Alterola and Token Communities to retail customers in private transactions. *See* Presentence Investigation Report ("PSR") ¶¶ 9-11, 13.

Individual 1 had previously been associated with a broker-dealer that was registered with the SEC.[1] In other words, Individual 1 had previously satisfied the requirement under the federal securities laws that individuals who engage in the business of effecting transactions in securities for the account of others—*i.e.*, those who act as brokers—register with the SEC. Registered brokers are generally subject to certain duties and obligations, among them a duty of fair dealing

---

[1] Records from the brokerage industry's self-regulatory organization, FINRA, reflect that, in 2005, Individual 1 passed the Series 7 Exam, which is the General Securities Representative Examination. *See* PSR at 23. In 2006, Individual 1 also passed the Series 63 Exam, which is Uniform Securities Agent State Law Examination. *See id.*

2

and an obligation to recommend only those investments or investment strategies that are suitable for their customers.  The SEC, in its Guide to Broker Dealer Registration, notes that the duty of fair dealing includes "disclos[ing] certain material information (i.e., information the customer would consider important as an investor)" and "charg[ing] prices reasonably related to the prevailing market."[2]  *See* PSR ¶12.

Individual 1, with Greyling's assistance and support, acted as a broker during the relevant timeframe, selling shares of Alterola and Token Communities from Trends to retail customers.  In so doing, Individual 1 generated over $1.9 million in proceeds from over 25 customers from around the country.  At no point, however, did Individual 1 register with the SEC as a broker (or associate with a broker so registered), as required by the federal securities laws.  *See* PSR ¶¶ 13-14, 20.

For Individual 1's work selling shares for Trends, Greyling agreed to pay, and caused Trends to pay, Individual 1 an approximately 40% commission—meaning, approximately 40% of the value of Individual 1's customer orders, which equaled over $800,000.  Neither Individual 1 nor Greyling disclosed this exceptionally high commission rate to Individual 1's customers.  *See* PSR ¶¶ 13-14.

As part of his pitch to induce customers to buy shares of Alterola and Token Communities, Individual 1 often identified himself as the customers' broker and/or wealth manager.  Individual 1 also regularly represented that the investments were promising (*e.g.*, telling a customer that s/he was "about to become a millionaire"), at times made false statements about market activity (*e.g.*, telling a prospective customer that Alterola "is starting to trade today"), and regularly made predictions about when customers would be able to deposit and sell shares that proved to be

---

[2] *See* U.S. SECURITIES & EXCHANGE COMMISSION, "Guide to Broker Dealer Registration," *available at* https://www.sec.gov/about/divisions-offices/division-trading-markets/division-trading-markets-compliance-guides/guide-broker-dealer-registration (last visited December 3, 2024).

incorrect (*e.g.*, persistently telling customers that Token Communities would soon start trading on the OTC Market). *See* PSR ¶¶ 13, 15-18.

Trends was ultimately unable to deliver on its obligations and promises to promptly deliver Alterola shares to customers. In several cases, it took Trends months or years to deliver Alterola shares to customers, which stemmed from the fact that, when Individual 1 first began selling shares to customers, Trends did not yet formally own the shares. (Trends genuinely expected to soon own the shares, but the transaction pursuant to which Trends would have acquired the shares unexpectedly fell through.) In addition, the Token Communities shares that Individual 1 sold to numerous customers were ultimately worthless as a practical matter. Such customers were generally unable to deposit or trade the securities because Token Communities (the company) failed to file all the necessary financial reports with the SEC in a timely fashion. *See* PSR ¶¶ 16-18.

Greyling, for his part, aided and abetted Individual 1's activities as an unregistered broker throughout. In addition to causing Trends to pay Individual 1, Greyling at times also emailed Individual 1's customers about the companies' market potential, and Greyling provided Individual 1 with a template greeting email to send prospective customers about Token Communities. Greyling also worked with Individual 1 to attempt to quell customers' concerns. In so doing, Greyling and Individual 1 at times made overly optimistic statements about when customers would receive their shares, when the companies would be current on their filings, and which brokers would supposedly accept the shares for deposit. *See* PSR ¶¶ 15, 18-19.

Finally, as part of Individual 1's efforts to induce share purchases, Individual 1 at times also sought assistance from Greyling to show market activity in Token Communities stock. At Individual 1's request, Greyling at times entered small orders to buy or sell Token Communities stock in the public market, which Greyling knew constituted improper and artificial pre-arranged

trading. The purpose of the trades was to show market activity in the stock (when virtually no genuine market activity existed) in order to induce prospective customers to buy shares in private transactions from Trends. Greyling at times also requested that a family friend submit similar orders for the same purpose, *i.e.*, to induce customers to purchase Token Communities shares from Trends. *See* PSR ¶ 22.

Individual 1 died in June 2023. *See* PSR ¶ 21. On August 28, 2024, Greyling pleaded guilty to an information charging one count of acting as an unregistered broker (aiding and abetting), in violation of 15 U.S.C. §§ 78o(a)(1) and 78ff(a), 18 U.S.C. § 2. *See* Dkts. #1, 12.

## GUIDELINES RANGE, AGREED-UPON DISPOSITION, & FORFEITURE

The parties entered into a plea agreement pursuant to Rule 11(c)(1)(C) that included an agreed-upon sentencing guidelines calculation and an agreed-upon disposition in the form of a cap on the severity of Greyling's sentence. *See* Dkt. #4. The parties have also since agreed on an amount of forfeiture, discussed further below.

*Sentencing Guidelines Range*

As reflected in the plea agreement, the parties agree that Greyling's total offense level is at least 3, with the government taking the position that, based on an upward departure, it is no greater than 7. In either case, the associated guidelines range is 0-6 months, in Zone A.

The parties reach this conclusion based on the following: (i) a base offense level 7, because the statutory maximum term of imprisonment is 20 years (USSG § 2B1.1(a)(1)); (ii) a 2-level reduction for acceptance of responsibility (USSG § 3E1.1); and (iii) a 2-level reduction because Greyling qualifies for the reduction for certain zero-point offenders (USSG § 4C1.1). The government also contends that a 4-level upward departure is appropriate pursuant to Section 2B1.1, Application Note 21(A) ("Upward Departure Consideration"), because an offense level of 7 under Section 2B1.1 (and a total offense level of 3) "substantially understates the seriousness of the

offense." Specifically, the government contends that a 4-level upward departure is appropriate based on consideration of the purpose of the enhancement in Section 2B1.1(b)(20)(A)(ii). That enhancement applies, *inter alia*, when the offense of conviction involved a violation of the securities law and the defendant was, at the time of the offense, a registered broker. Here, neither Individual 1 nor Greyling were registered brokers, but Individual *should have* been so registered. An upward departure of 4-levels would be appropriate to address the heightened responsibilities that brokers have under the securities laws, which responsibilities Individual 1 formally avoided by failing to register with the SEC.

The government understands that Probation does not agree with the parties' calculation of the sentencing guidelines, and the government submitted objections to certain enhancements that Probation applied, as discussed further below.

*Objections to Loss & Victim Enhancements*

Probation applied a 16-level enhancement pursuant to Section 2B1.1(b)(1)(I) and Application Note 3(E)(v)(I) (the "Application Note") based on the amount paid by Individual 1's customers to Trends. *See* PSR ¶ 28. The Application Note provides as follows, in relevant part:

> (v) Certain Other Unlawful Misrepresentation Schemes.—In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals … loss shall include the amount paid for the … services … rendered …, with no credit provided for the value of those … services.

Probation also applied a 2-level enhancement pursuant to Section 2B1.1(b)(2)(A) based on determining that Individual 1's customers constituted ten or more victims. *See* PSR ¶ 29. For the reasons set forth in government's Objections #1 and #2 (*see* PSR at 23-26) and briefly discussed below, the government respectfully disagrees with Probation's application of these enhancements to the facts of the narrow offense of conviction in this matter.

*First*, the Application Note requires that an individual in the scheme have "falsely pos[ed]" as a "licensed" professional.  Here, while Individual 1 failed to *register* with the SEC, he did not fail to pass the necessary exams to act as a broker.  To the contrary, Individual 1 had passed both his Series 7 and Series 63 exams years earlier, which presumably is why he was able to previously associate with a registered broker.[3]  In addition, while Individual 1 did identify himself at times as his customers' broker or wealth manager, the government is not aware of instances where Individual 1 explicitly or implicitly represented to any customers that he held any licenses that he did not hold.  Nor did Individual 1 make any representations to his customers one way or another about whether he was registered with the SEC.  *Cf. United States v. Kieffer*, 621 F.3d 825, 829-30, 834 (8th Cir. 2010) (applying Application Note 3(F)(v)(I) where defendant falsely represented he had graduated law school and been admitted to a state bar as an attorney).

*Second*, the Application Note requires that "services" have been rendered to a "victim," and the victim enhancement requires there to be ten or more "victims."  To be sure, Individual 1's customers ultimately lost money on their investments (and the SEC is pursuing a parallel civil enforcement action related to those losses).  But losing money does not necessarily make the customers "victims" for purposes of Section 2B1.1 for the narrow criminal offense of conviction in this matter.  This is because a "victim" is defined as "any person who sustained any part of … actual loss," meaning "reasonably foreseeable pecuniary harm that *resulted* from the offense."  *See* USSG § 2B1.1(b)(1)(C)(i) (emphasis added) and App. Notes, Definitions.  The offense of

---

[3] The SEC's guide to broker-dealer registration notes that, to associate with a registered broker-dealer and effect securities transactions, an individual must meet qualification requirements, including passing a securities qualification examination. The most common such exam is the comprehensive Series 7 exam, which Individual 1 passed in 2005. *See* U.S. SECURITIES & EXCHANGE COMMISSION, "Guide to Broker-Dealer Registration: How to Register as a Broker-Dealer," § III.E, *available at* https://www.sec.gov/about/divisions-offices/division-trading-markets/division-trading-markets-compliance-guides/guide-broker-dealer-registration#III (last visited December 5, 2024).

conviction in this matter is (only) acting as an unregistered broker. Committing this offense does not require intent to obtain money or property from another, and here, the evidence does not suggest or establish that the customers' losses were the *result* of Individual 1's failure to register with the SEC as required. Indeed, Greyling (and Individual 1) would still have satisfied the elements of the offense even if their customers had sold their shares at a profit.

In addition, Individual 1's customers did not pay Individual 1 for *services* in the same way that individuals pay lawyers or doctors for services. *See United States v. Mooney*, No. 9:14-CR-00054, 2016 WL 6583108, at *3 (D.S.C. Nov. 7, 2016) (noting that "courts have applied note 3(F)(v)(I) to defendants who posed as doctors or lawyers to accomplish their offenses" and that the purpose of the application note was to resolve "whether defendants who pose as licensed professionals may offset loss … by the value of 'satisfactory' services rendered"). Rather, Individual 1's customers paid Trends for shares—*i.e.*, for objects more akin to goods than services.[4]

*Third*, and finally, the Application Note requires that the services have been "fraudulently rendered." Here, a significant portion of the conduct that would support a conclusion that Individual 1's services were rendered fraudulently (*i.e.*, with fraudulent intent) and, critically, that Greyling shared Individual 1's fraudulent intent, cannot be used to determine the applicable guidelines range—namely, Individual 1's and Greyling's artificial and improper trading. *See* PSR ¶ 22, n.1.

---

[4] To be sure, Individual 1 received a 40% portion of the sale proceeds as a commission for his role in facilitating the sales, equal to approximately $800,000. If the Court determines a loss enhancement applies based on the Application Note (notwithstanding the government's position), the enhancement could *only* relate to the commission amount, equal to only a 14-level enhancement (rather than a 16-level enhancement), based on the commission amount falling between $550,000 and $1,500,000. *See* USSG § 2B1.1(b)(1)(H).

For all of the above reasons, the government respectfully disagrees with Probation's application of loss and victim enhancements, respectively, as to the offense conduct for the narrow offense of conviction in this matter.

*Objection to Securities Offense Enhancement*

Probation also applied a 4-level enhancement pursuant Section 2B1.1(b)(20)(A) based on Probation's determination that, at the time of the offense, Greyling was a person associated with an investment adviser (namely, Individual 1). *See* PSR ¶ 30. While the government believes an upward departure (from a total offense level of 3 to a total offense level of 7) is appropriate based on the purpose of this enhancement (for the reasons discussed above), the government respectfully disagrees with Probation's determination that the enhancement directly applies.

The enhancement in Section 2B1.1(b)(20)(A) provides in relevant part:

> (20) If the offense involved—
>
> (A) a violation of securities law and, at the time of the offense, the defendant was … (iii) an investment adviser, or a person associated with an investment adviser; …
>
> increase by 4 levels.

In support of its determination that this enhancement applies, Probation cites a number of activities undertaken by Individual 1 to support Probation's conclusion that Individual 1 was an "investment adviser." These include Individual 1's solicitation of customers to buy shares from Trends and advice to customers about the merits of the investments. *See* PSR ¶ 30; *see also* PSR at 28-29. But this conduct is what qualified Individual 1 as a *broker*, the predicate status for Greyling's offense of conviction (for aiding and abetting Individual 1 acting as an unregistered broker). Critically, under the definition of an "investment adviser" in the Investment Advisers Act of 1940, brokers who provide investment advise "incidental" to the conduct of their business as a

9

broker are *not* investment advisers unless they receive special compensation for such advice. That definition provides in relevant part:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities …; <u>but does not include</u> … (C) <u>any broker</u> … <u>whose performance of such services is solely incidental to the conduct of his business as a broker</u> … <u>and who receives no special compensation therefor</u>; ….

15 U.S.C. § 80b-2(a)(11) (emphasis added). Here, Individual 1's *only* compensation was his 40% commission paid by Trends for selling shares to customers—*i.e.*, the compensation that was a significant fact establishing that Individual 1 was a broker. *See SEC v. Gel Direct Tr.*, No. 22-CV-9803, 2024 WL 1374902, at *2–3 (S.D.N.Y. Mar. 31, 2024) (noting that courts "consider a variety of factors to determine whether an individual is acting as a broker, including whether the person: (1) actively solicited investors; *(2) receives transaction-based compensation*; …; and/or (9) makes valuations as to the merits of the investment or gives advice.") (cleaned up and emphasis added). Individual 1's customers did not pay Individual 1 any extra or special compensation for his investment advice; such advice was, instead, "incidental" to Individual 1's work selling shares for Trends as a broker. Accordingly, Individual 1 was not an "investment adviser" such that Greyling could be eligible for an enhancement under Section 2B1.1(b)(20)(A) based on Greyling's association with Individual 1.[5] For this reason, the government respectfully objects to Probation's direct application of the 4-level enhancement.

*Agreed-Upon Disposition*

In the parties plea agreement, reached pursuant to Rule 11(c)(1)(C), the parties agreed that disposition in this matter would include: (i) a sentence not to exceed incarceration for six months

---

[5] In addition, just as Individual 1 did not register as a broker with the SEC during the relevant period, the government is not aware of any evidence that Individual 1 registered with either the SEC or any state as an investment adviser.

followed by supervised release for 24 months; (ii) no fine; (iii) a $100 special assessment; (iv) no restitution; and (v) forfeiture as set forth later in the plea agreement (and discussed further below). *See* Dkt. #4 at 3. As noted during the plea hearing, the parties agree that a sentence of probation would be consistent with the agreed-upon disposition.

*Forfeiture*

The government seeks, and the defendant assents to, forfeiture in the amount of $229,576, which is a reasonable approximation of the gain that Greyling obtained from Individual 1's sale of shares while acting as an unregistered broker.[6] The government calculated this forfeiture amount by first calculating the ratio of Greyling's withdrawals from Trends' bank accounts to Trends' total inflows during the relevant period that came from sources other than Greyling. The government then applied that ratio to the funds Trends obtained from Individual 1's customers. If the Court accepts the parties' plea agreement, the government asks the Court to grant the government's provisional motion for forfeiture (Dkt. #17) and incorporate the forfeiture amount into the judgment pronouncing Greyling's sentence.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The below assessment of the § 3553(a) factors, along with the entire record in this case, supports a determination that a sentence of one year probation, with the first six months served on home detention, is sufficient, but not greater than necessary, to meet the goals of sentencing in this matter.

### A. Nature and Circumstances of the Offense

Greyling's willful use of an unregistered broker to sell shares for Trends at an exceptionally high commission rate was a serious offense, even if not a common criminal offense. The securities

---

[6] In the plea agreement, the parties agreed that forfeiture shall not exceed $628,610. *See* Dkt. #4 at 4.

11

laws and regulations exist to protect investors while also facilitating capital formation. That regulatory structure has been carefully crafted over many decades, and one of its important goals is to ensure that those who act as brokers meet certain foundational obligations to their customers. One aspect of that structure involves requiring brokers to register with the SEC, whereby brokers announce their role (with all its attendant obligations) to both the relevant regulatory agency and the investing public.

Individual 1 failed to do so, and Greyling aided and abetted that failure. While a failure to register with the SEC, standing alone, does not result in harm to any particular investor, it degrades the integrity of the securities markets overall. And here, Individual 1's actions as a broker fell well short of upstanding. Among other actions, Individual 1 failed to disclose his extraordinarily high commission rate, made extreme representations to customers about anticipated profits, made false statements about trading activity, made inaccurate predictions about when customers would receive and be able to deposit and sell shares, and organized artificial and improper trading to induce customers to buy shares. Individual 1 did so all while having failed to register with the SEC as required, thereby choosing to hide from the federal regulator tasked with ensuring investor protection. And Greyling aided him in that endeavor, all so that Greyling could benefit from Individual 1's non-compliant (but productive) work attracting capital for Greyling's speculative business plans. The offense of conviction, therefore, was serious.

### B. History and Characteristics of the Defendant

In his favor, Greyling stands before the Court with no criminal history, and Greyling has taken responsibility for his misconduct with his guilty plea to an information. In addition, in his personal life, Greyling appears to have made a concerted effort to improve his overall well-being and future trajectory, not just for his benefit but also for the benefit of his children. This effort is a further indication of Greyling's acceptance of responsibility.

### C. Deterrence and Promoting Respect for the Law

General deterrence and the need to promote respect for the law are important factors in cases of this nature. The United States' securities laws and regulations are complex in many ways, owing to their competing goals. Investors had few protections before these laws and regulations were created, and it was the stock market crash of 1929 that led to the passage of the Securities Act of 1933, the first federal securities statute. Today, our securities markets play an integral role in our nation's economic prosperity, helping to drive, among other things, innovation, job creation, education savings, and retirement savings. And these markets do so in significant part because of the structure—the rules and regulations—that govern the relationships between market participants. Ensuring that those rules and regulations are followed—including by deterring those who would willfully violate them—is critically important. General deterrence and the need to promote respect for the law are therefore important factors in determining the appropriate sentence in this case.

## CONCLUSION

For the reasons discussed herein, and based on the entire record in this case, the government recommends that the Court accept the parties' plea agreement and sentence Greyling to one year probation, with the first six months served on home detention. The government also requests that the Court grant the government's provisional motion for forfeiture and incorporate the forfeiture amount of $229,576 into the judgment. *See* Dkt. #17.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   */s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
Tel: (617) 748-3100
james.drabick@usdoj.gov

Date:  December 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be sent to those indicated as non-registered participants.

*/s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney

Dated:  December 5, 2024